UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

RAMZY ABDUL HRRAHMAN,

                Petitioner,                Case No. 1:15-cv-472

v.                                        Honorable Robert J. Jonker

STEVE RIVARD,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner is serving a term of 10 to 25 years, imposed by the Ingham County Circuit Court
on February 20, 2013, following a bench trial in which Petitioner was convicted of second-degree
home invasion, MICH. COMP. LAWS § 750.110a(3). Petitioner was sentenced as a fourth-offense
habitual offender, MICH. COMP. LAWS § 769.12. In his *pro se* petition, Petitioner raises seven
grounds for relief, as follows:

I.        THE TRIAL COURT ERR[ED] IN THE SCORING OF PRV 4.

II.      WHETHER THE TRIAL COURT ERRED IN THE SCORING [OF]
           OFFENSE VARIABLE (OV) 16?

III.    WHETHER PETITIONER'S 4TH AND 14TH AMEND[MENT] RIGHTS
           WERE VIOLATED TO EFFECTUATE AN ARREST?

IV.    DID THE COURT ERR AND ATTORNEY LYLE D. WARREN ERR IN
           FAILING TO ADVISE PETITIONER OF HIS RIGHT AGAINST SELF-
           INCRIMINATION THUS VIOLATING PETITIONER'S 5TH
           CONST[ITUTIONAL] AM[ENDMENT] RIGHT BY CALLING
           PETITIONER TO TAKE THE STAND?

V.    WAS THE TOTALITY OF EVIDENCE LEGALLY SUFFICIENT TO HALT THE INVESTIGATION AND CONVICT PETITIONER?

VI.   DID ATTORNEY MARK E. TAYLOR COMPROMISE PETITIONER'S ALIBI OF INNOCENCE AND VIOLATE PETITIONER'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL BY HIS ABSENCE DURING PROFFER PROCESS?

VII.  WAS ATTORNEY LYLE D. WARREN INEFFECTIVE FOR #1) FAILING TO CONFRONT AND IMPEACH COMPLAINING WITNESS (L.P.D. CHARLES FUNK) WHO FILED COMPLAINT BUT NEVER TESTIFIED, AND #2) INEFFECTIVE FOR FAILING TO OBJECT AND IMPEACH PROSECUTION'S "EXPERT" WITNESS L.P.D. OFFICER KEN LUCAS' TESTIMONY AND OPINIONS INSTEAD OF VOUCHING BY SAYING "IT'S CLEAR THAT HE IS QUALIFIED["] PRIOR TO EVER CROSS-EXAMINING?

(Pet., ECF No. 1-1, PageID.17.) Respondent has filed an answer to the petition (ECF No. 14) stating that the grounds should be denied because they are either noncognizable state law claims or they have no merit.[1] Upon review and applying the AEDPA standards, I recommend that the petition be denied.

**Procedural History**

A.    **Trial Court Proceedings**

Petitioner was accused of breaking into the home of Ms. Dawn Davis and her ninety-four year old mother, and taking items from that residence. Petitioner was subsequently charged with one count of second-degree home invasion, MICH. COMP. LAWS § 750.110a(3), and being an habitual offender, fourth offense, MICH. COMP. LAWS § 769.12. On July 10, 2012, Petitioner was

_____

[1]Respondent notes that Petitioner has been moved from the St. Louis Correctional Facility, where Petitioner originally filed this petition, and is currently housed at the Cooper Street Correctional Facility. Respondent asks this Court to amend the caption in this matter to name Joseph Barrett, the warden at the Cooper Street Correctional Facility, as the proper party Respondent. (Resp't Answer in Opp'n, ECF No. 14, PageID.59.) This Court, however, does not require that a petition be amended each time a prisoner is transferred to a different state correctional facility. *See Heise v. Smith*, No. 1:13-cv-26 (W.D. Mich.) (ECF No. 24) (Kent, m.j.).

bound over for trial on the charges. On January 14, 2013, the day set for trial, Petitioner waived his right to a jury trial and requested a bench trial.

The prosecution began their case-in-chief by calling Ms. Dawn Davis to the stand. She testified that during May 2011 she lived at her home on West Jolly Road in the city of Lansing with her mother. (Trial Tr. 10-11, PageID.143-144.) At approximately 10:30 on the morning of May 7, 2011, Ms. Davis left her house with her mother in order to perform a number of errands. (Trial Tr. 11, PageID.144.) When the two returned, sometime after 12:00 p.m., Ms. Davis noticed that the back door to her house had been kicked open. (Trial Tr. 11, 14, PageID.144.) Later, she noticed that the window next to her back door was broken. She testified that the window had not been broken when she left earlier that day. (Trial Tr. 13, PageID.144.)

Inside, Ms. Davis found items strewn about the kitchen, and further noticed jewelry tossed about her mother's room. Ms. Davis testified that a camera, her mother's wedding rings, a safe, and the safe's contents were missing from her house. (Trial Tr. 14, 20, PageID.144, 146.) She noted that the safe originally took two people, plus a dolly, to move into place. (Trial Tr. 16, PageID.145.) Seeking to discredit the defense's theory that Petitioner believed he was assisting another individual move items the individual was lawfully entitled to possess, the prosecution asked Ms. Davis whether she had boxed or bagged items up so that it looked like she was moving. Ms. Davis testified she had not, and further testified she did not know Petitioner, and there was no reason for him to be in her home. (Trial Tr. 18, PageID.145.)

The prosecution next called Officer Rachel Bahl, a police officer employed by the Lansing Police Department. Officer Bahl testified she was dispatched to Ms. Davis' residence after Ms. Davis called to report her house had been broken into. Upon arriving, Officer Bahl observed

- 3 -

a broken basement window, and made contact with Ms. Davis. Officer Bahl took a statement from Ms. Davis, and walked with her through the house. The officer took photos of areas where Ms. Davis indicated things had been ransacked and where items were missing. (Trial Tr. 23, PageID.147.) Officer Bahl testified that she also was able to take fingerprints from a jewelry box in an upstairs bedroom. (Trial Tr. 24-25. PageID.147.)

Next, the prosecution called Jason Davis, a detention officer with the city of Lansing Police department. He testified his duties included conducting custodial searches and fingerprinting. (Trial Tr. 31-32, PageID.149.) Officer Davis testified that he took Petitioner's fingerprints on June 25, 2012. (Trial Tr. 33, PageID.149.) The court next heard testimony from Kenneth Lucas, a fingerprint technician employed by the city of Lansing Police department. (Trial Tr. 37, PageID.150.) The prosecution offered him, with no objection, as an expert in latent fingerprint identification. (Trial Tr. 39, PageID.151.) Officer Lucas testified that he had examined the latent prints taken by Ms. Bahl from Ms. Davis' residence and compared them against the known prints of Petitioner. (Trial Tr. 41, PageID.151.) He concluded that the two latent prints from one of the prosecution's exhibits matched the number 8 and number 9 digits from Petitioner's known print. (Trial Tr. 42, PageID.151.) At that point, the prosecution rested. (Trial Tr. 46, PageID.152.)

After a brief recess, the Petitioner's defense counsel began his presentation by stating the defense's theory was that there was insufficient evidence to prove beyond a reasonable doubt Petitioner's conduct satisfied all the elements of second-degree home invasion. Petitioner then took the stand to testify on his own behalf. Petitioner testified that he was known in the area as a handyman and would sometimes help people move. On the date in question, he was approached by a friend named Ed Washington who asked Petitioner to help him move some items. Petitioner

testified he had previously helped Mr. Washington with a similar task. Petitioner then testified that he drove with Ed Washington in Ed's van to Ms. Davis' residence. When they arrived, Mr. Washington told Petitioner to stay in the van while he went inside, and then later came out to let Petitioner in. Because of where the van was situated, Petitioner could not see Mr. Washington enter Ms. Davis' home. After helping move some items, including the safe, to the van, Mr. Washington drove off with all the items they had taken. Later, he gave Petitioner a gold ring as a gift. Petitioner testified he subsequently pawned the ring at a local pawn shop. Petitioner's counsel then introduced the pawn shop receipt which indicated that Petitioner had pawned the ring on May 7, 2011, the day of the home invasion. (Trial Tr. 48-69, 153-158.)

After hearing closing arguments, the court found Petitioner guilty on the second-degree home invasion charge and further found Petitioner qualified as a habitual offender, fourth offense. (Trial Tr. 80-83, PageID.161-162.) At the sentencing hearing, held on February 20, 2013, the prosecution requested that offense variable (OV) 16 be increased to ten points from the five points it was originally set at, as the wedding rings that were stolen had significant sentimental value. The court accepted the request, over the defense's objections. (Sentencing Tr. 3-4, PageID.165.) Petitioner's minimum guideline sentence thus became 36 to 142 months. (Sentencing Tr. 4, PageID.165.) The court proceeded to sentence Petitioner to 120 months to 300 months' incarceration with 240 days of credit. (Sentencing Tr. 8, PageID.166.)

## B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on September 11, 2013, raised the same issues as those in grounds I and II of the instant petition together with an additional issue claiming that the pre-sentence investigation

report (PSIR) needed to be corrected because a juvenile misdemeanor larceny conviction was incorrectly categorized as an adult conviction. (*See* Def.-Appellant's Br. on Appeal, ECF No. 15-7, PageID.193.) Petitioner's counsel also filed a motion to remand, raising the PRV 4 and misdemeanor larceny issues. This motion was granted by the Michigan Court of Appeals on November 15, 2013. (*See* 11/15/13 Mich. Ct. App. Ord. ECF No. 15-7, PageID.267.) Pursuant to the court of appeals' order, the trial court heard argument on the remanded issues on December 11, 2013. (*See* Hr'g on Mot. to Correct, ECF No. 15-6, PageID.167.) During the hearing, the prosecution agreed to amend PRV 4 to a score of zero from a previous score of two. The prosecution further agreed to amend the PSIR to reclassify the misdemeanor larceny conviction as a juvenile conviction. (Hr'g on Mot. to Correct, 3-4, ECF No. 15-6, PageID.169.) The amendments to the pre-sentence report did not change Petitioner's sentencing range.

Petitioner returned to the court of appeals. Petitioner submitted a Standard 4 brief that was received by the Court of Appeals on November 12, 2013. In it, Petitioner raised the same issues as those contained in grounds III through VI of the instant petition. Petitioner also raised an additional claim that the 180-day rule and his constitutional right to a speedy trial had been violated. (Appellant's Supplemental Br. 1-20, ECF No. 15-7, PageID.233-252.) On May 21, 2014, Petitioner filed an amended brief, adding an additional claim identical to ground VII of the instant petition. (Appellant's Am. Supplemental Br. 1-11, ECF No. 15-7, PageID.315-325.) By unpublished opinion issued on September 9, 2014, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 9/9/14 Mich. Ct. App. Opinion (MCOA Op.), ECF No. 15-7, PageID.171-177.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court.  Petitioner raised the same claims as contained in his appellate and supplemental briefs that were rejected by the Michigan Court of Appeals, except that Petitioner did not raise the issue from his Brief on Appeal concerning the juvenile misdemeanor larceny conviction, nor the issue from his standard 4 brief concerning the 180-day rule and the speedy-trial right.  By order entered March 31, 2015, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* Mich. Ord., ECF No. 15-8, PageID.327.)

Petitioner did not appeal to the United States Supreme Court or seek collateral review from the trial court.  Instead, Petitioner filed the instant petition on May 6, 2015.

### **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a

prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v.*

*Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

## Discussion

### I & II.        Sentence Scoring.

In his first two grounds for habeas relief Petitioner claims the trial court erred in scoring PRV 4 in his PSIR, and that the trial court further erred in scoring ten points for OV 16. Petitioner claims these errors violate his due process rights.

Petitioner's appellate brief to the Michigan Court of Appeals argued that the trial court erred in scoring 2 points for PRV 4. This score was based on a prior low severity juvenile adjudication for felonious assault in the Wayne County Probate Court. Petitioner's appellate counsel argued that though Petitioner was entitled to have counsel for that action, it was unknown whether Petitioner actually received counsel. (*See* Def.-Appellant's Br. on Appeal 4, ECF No. 15-7, PageID.197.) When Petitioner's counsel contacted the Wayne County Court, she was advised that those records had been destroyed. (*See* Def.-Appellant's Br. on Appeal 5, ECF No. 15-7, PageID.198.) In the motion to remand, counsel admitted that removal of the conviction would not change Petitioner's minimum guideline range, but argued that Petitioner was entitled to an accurate PSIR. Counsel also argued that OV 16 should be scored at 5, instead of 10. Petitioner's attorney contended that they prosecution had only "argued that the items taken had sentimental value since some of the rings were wedding rings taken from the home." Counsel argued this was insufficient to score the variable at 10 points. (*See* Def.-Appellant's Br. on Appeal 6-7, ECF No. 15-7, PageID.199-200.)

As previously noted, the Michigan Court of Appeals granted the motion to remand in order to allow Petitioner to challenge the scoring of PRV 4 and to request a correction of the PSIR. Thereafter, the trial court granted the request to remove Petitioner's juvenile conviction on page 3 of the report which amended the score of PRV 4 from 2 to 0 points. The court further amended the PSIR to properly classify another juvenile conviction which had mistakenly been listed as an adult conviction. (*See* 12/12/13 Order, ECF No.15-8, PageID.349–350.) During the hearing, it was also noted that the argument regarding OV 16 would be reserved for the court of appeals. Accordingly, when the issue came up again at the court of appeals, the court found the issues regarding Petitioner's juvenile convictions to be moot. (*See* MCOA Op. 3 n.2, PageID.173.) The court also found Petitioner's claim regarding OV 16 to be without merit.

Petitioner contends that he is still entitled to relief on these claims. Specifically, he alleges that all of his juvenile history from the PSIR needed to be destroyed pursuant to MICH. CT. R. 3.925(E).[2] He further alleges that his counsel rendered deficient performance by failing to protect his right to due process and "by failing to object to the court's manipulation of the hearing." (Pet. 1, PageID.18.) Finally, he maintains there was insufficient evidence produced to score OV 16 at 10 points. As discussed below, however, Petitioner's sentencing claims are non-cognizable.

---

[2] Petitioner's contention here is not exactly clear. His juvenile history of felonious assault in fact was removed from PRV 4, the subject of his first ground for relief. Petitioner may be referencing his juvenile misdemeanor larceny conviction that was mistakenly listed as an adult conviction and subsequently corrected to a listing as a juvenile history in the PSIR. As noted above, this was the second claim raised in his appellate brief to the court of appeals. In that brief, Petitioner's counsel noted that the PSIR contained a reference for a misdemeanor larceny, under $100 in section 3 of 15 of the report. Counsel noted Petitioner was only 16 years of age on the date of this conviction, and argued that the offense should be removed from that section and placed under the section corresponding to juvenile adjudications. (*See* Def.-Appellant's Br. on Appeal 5, ECF No. 15-7, PageID.198.) On remand, the trial court granted counsel's request. It appears that Petitioner claims the court needed to do more – it needed to strike the conviction entirely. But this is a different issue than the ground asserted. It appears Petitioner has conflated the first two grounds contained in his appellate brief. Only the first issue, regarding PSV 4, has been raised in the instant petition. The second issue has not been raised. Thus any scoring claim regarding that juvenile misdemeanor larceny conviction, in addition to being noncognizable (for reasons laid out below), would also be abandoned.

Furthermore, to the extent he argues these errors violates his due process rights, this claim is without merit.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 131 S. Ct. 13, 16 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 131 S. Ct. at 14; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984). Claims concerning the improper application of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief). Accordingly, Petitioner's claim that the scoring of PSV 4 and OV 16 violates Michigan Court Rules is noncognizable on habeas review.

Petitioner also fails to demonstrate a due process violation. A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Roberts v. United States,* 445 U.S. 552, 556 (1980), *quoted in Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false

information in imposing the sentence. *Tucker*, 404 U.S. at 447;*United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner does not identify any facts found by the court at sentencing regarding either PSV 4 or OV 16 that were either materially false or based on false information. Indeed, Petitioner's challenge falls well short of claiming that the information before the court was materially false. His argument would be more accurately characterized as claiming the information the court relied upon was insufficient or unreliable. In this case, Petitioner has already received the relief sought regarding PSV 4. Moreover, the trial court has made a factual finding that the wedding rings Petitioner stole had significant sentimental value to their owner, and that finding is presumed correct. To overcome that presumption Petitioner must present clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. Petitioner does not even attempt to make that showing. Accordingly, his challenge fails.

For all the above reasons, Petitioner's first two grounds for habeas relief should be denied.

### III.    Illegal Arrest

In his third ground for relief, Petitioner alleges that his arrest was invalid due to a deficient arrest warrant. Petitioner's assertion does not provide any basis for habeas corpus relief. *See Gerstein v. Pugh*, 420 U.S. 103, 119 (1975) (illegal arrest or detention does not void a subsequent conviction). The method by which petitioner's presence was procured at trial does not

provide a basis for invalidating his criminal conviction. *See Immigration & Naturalization Service v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."); *Frisbee v. Collins*, 342 U.S. 519, 522 (1952); *Ker v. Illinois*, 119 U.S. 436, 444 (1886); *Browning v. Jabe*, No. 88-1307, 1990 WL 6943, at * 1 (6th Cir. Feb. 1, 1990) ("petitioner's arguments that his arrest was absent probable cause . . . [are] irrelevant, as an unlawful arrest is not a defense to a valid conviction.") (*citing United States v. Crews*, 445 U.S. 463, 474 (1980)). Accordingly, his claim of illegal arrest is to no avail.

### IV.    Petitioner's Decision to Testify

The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). As the Supreme Court has explained, however:

> [t]he [Fifth] Amendment speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been "compelled" within the meaning of the Amendment.

*Id.* at 427 (quoting *United States v. Monia*, 317 U.S. 424, 427 (1943)). In this case, Petitioner complains that his trial testimony violated that Fifth Amendment right because the trial court failed to inform and advise him of his right to take or not to take the stand and effectively forced him to be a witness against himself. The Michigan Court of Appeals disagreed:

> Defendant also argues that his right to self-incrimination was violated because the trial court and his counsel failed to advise him of that right and elicit a waiver on the record. This argument is contrary to settled caselaw. "[A]n on-the-record waiver of [a] defendant's right to testify" is not required before he testifies. *People v Simmons*,

> 140 Mich App 681, 684; 364 NW2d 783 (1985). Rather, "an accused's decision to testify or not to testify is a strategic decision best left to an accused and his counsel." *People v Martin*, 150 Mich App 630, 640; 389 NW2d 713 (1986). Furthermore, defendant does not allege that he was unaware of his right against self-incrimination. Indeed, defendant alleges he invoked the right to end a police interrogation and it appears that he invoked it in a motion for a new attorney before trial. Similarly, defendant does not contend that he would not have testified, or that the outcome of the proceedings would have been different had he chosen not to testify. Accordingly, we assign no error.

(PageID.174.)   To the extent Petitioner seeks relief under state law, his claim is not cognizable.  It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68.  The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).

          As regards a federal claim, the Supreme Court has characterized the Fifth Amendment right as an "essential mainstay of our adversary system," *Miranda v. Arizona*, 384 U.S. 436, 460 (1966), and inherent in this right is the individual's "right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Id.* (quoting *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).  A defendant may waive these rights, however, provided the waiver is made "voluntarily, knowingly and intelligently." *Id.*

          In determining whether a waiver of these rights is valid, the Supreme Court has identified two requirements: First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or

deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Moreover, "waiver of certain fundamental rights can be presumed from a defendant's conduct alone, absent circumstances giving rise to a contrary inference." *United States v. Stover*, 474 F.3d 904, 908 (6th Cir. 2007).

Petitioner does not provide a constitutional basis for his assertion that the trial court should have inquired into his decision to testify and inform him of his Fifth Amendment rights. Clearly, Petitioner's decision to testify was voluntary. Indeed, it was his right to testify, if he so chose. He does not allege any facts showing that his testimony was the product of intimidation, coercion, or deception. Moreover, Petitioner, as a fourth-offense habitual offender, was an experienced criminal defendant. Petitioner plainly was aware of the nature of the right being abandoned, and the consequences he faced from abandoning that right. Furthermore, the transcript from a pre-trial proceeding demonstrates Petitioner knew about his right to remain silent. (*See* 10/31/2012 Pretrial Hr'g 4, ECF No. 15-2, pageID.135.) Petitioner's belated, self-serving assertion that he would not have testified had he again been informed of his *Miranda* rights is baseless. Accordingly, The Michigan Court of Appeal's decision did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or result in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

V.    **Sufficiency of the Evidence**

In his fifth ground for habeas relief, Petitioner challenges the sufficiency the evidence for his conviction of second-degree home invasion.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

The *Jackson v. Virginia* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. Moreover, because both the *Jackson* standard and AEDPA apply to Petitioner's claims, "'the law commands deference at two levels in this case: First, deference should be given to the trier-of-fact's verdict, as contemplated by *Jackson*; second, deference should be given to the Michigan [trial court's] consideration of the trier-of-fact's verdict, as dictated by AEDPA.'" *Davis v. Lafler*, 658 F.3d 525, 531 (6th Cir. 2011) (en banc) (quoting *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008)). This standard erects "a nearly insurmountable hurdle" for petitioners who seek habeas relief on sufficiency-of-the-evidence grounds. *Id*. at 534 (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

- 17 -

The Michigan Court of Appeals applied the following standard to Petitioner's challenge:

> When examining whether there was sufficient evidence to support a conviction, we review the evidence de novo in a light most favorable to the prosecution to determine "whether a rational trier of fact could have found that the essential elements of the crime were proved beyond reasonable doubt." *People v Ericksen*, 288 Mich App 192, 196; 793 NW2d 120 (2010). In reviewing the sufficiency of the evidence, this Court must not interfere with the role of the trier of fact in determining "'the weight of the evidence or the credibility of witnesses.'" *People v Eisen*, 296 Mich App 326, 331; 820 NW2d 229 (2012), quoting *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Furthermore, "[i]t is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). "'Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime.'" *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999), quoting *People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993).

(MCOA Op. 4, ECF No. 15-7, PageID.174.) The court of Appeals cited *People v. Ericksen*, 288 Mich. App. 192 (Mich. 2010), for the sufficiency standard. The *Ericksen* court, in turn, relied on *People v. Hawkins*, 245 Mich. App. 439 (2001). *Hawkins* relied on *People v. Petrella*, 224 Mich. 221 (1985). Finally, *Petrella* references *People v. Hampton*, 407 Mich. 354 (1979), and *Hampton* cites *Jackson* as the source of the standard. Thus it cannot be said that the standard applied by the court of appeals was contrary to clearly established federal law.

The Michigan Court of Appeals applied the standard, at length, as follows:

MCL 750.110a(3) provides:

> A person who breaks and enters a dwelling with intent to commit a felony, larceny, or assault in the dwelling, a person who enters a dwelling without permission with intent to commit a felony, larceny, or assault in the dwelling, or a person who breaks and enters a dwelling or enters a dwelling without permission and, at any time while he or she is entering, present in, or exiting the dwelling,

- 18 -

commits a felony, larceny, or assault is guilty of home invasion in the second degree.

The trial court first found that defendant had broken into the house based on a broken window and a broken interior door. It found that defendant had entered the house because defendant admitted he had entered it and his fingerprints were found on a jewelry box. Finally, the trial court found that defendant had the intent to commit a felony because "just based upon the way things were moved around and scattered and what have you, it's fairly obvious that there was an attempt to commit a crime in that dwelling when it was entered by the Defendant." The trial court discredited most of defendant's testimony, other than his admission that he had entered the house. This was within the trial court's purview because, at a bench trial, the court as the trier of fact evaluates witness credibility. *People v Jackson*, 178 Mich App 62, 64; 443 NW2d 423 (1989).

We find that the trial court's findings were sufficient to sustain its verdict. Evidence that a basement window had been broken and that a door had been kicked in were clearly sufficient to establish a breaking. Evidence that defendant's fingerprints were found on a jewelry box was likewise sufficient to establish that defendant had in fact entered the house, but even if they were not, defendant admitted he entered the house. Defendant admitted removing items from the house. Finally, it is clear that the house was in a state of disarray when the owner returned, which evinced an intent to commit a larceny. The owner also testified that several items were, in fact, stolen.

Defendant primarily takes issue with fingerprint evidence presented at trial. He argues that a sufficient chain of custody was not established. However, any break in the chain of custody "does not require automatic exclusion of the evidence." *People v White*, 208 Mich App 126, 133; 527 NW2d 34 (1994). Rather,

> [t]he threshold question remains whether an adequate foundation for admission of the evidence has been laid under all the facts and circumstances of each individual case. Once a proper foundation has been established, any deficiencies in the chain of custody go to the weight afforded to the evidence, rather than its admissibility. [*Id.*]

The officer who took latent fingerprints at the scene of the crime identified them at trial. Another officer identified fingerprints he took from defendant. The fingerprint identification expert then identified those prints as the ones he compared. We find that this was an adequate foundation. Moreover, defendant admitted that he touched the jewelry box.

Defendant also argues that he did not receive a forensic report regarding the fingerprint identification expert's analysis pursuant to MCR 6.202. That rule provides in pertinent part:

> Upon receipt of a forensic laboratory report and certificate, *if applicable*, by the examining expert, the prosecutor shall serve a copy of the laboratory report and certificate on the opposing party's attorney or party, if not represented by an attorney, within 14 days after receipt of the laboratory report and certificate. [MCR 6.202(B) (emphasis added).]

In this case, it does not appear that a forensic laboratory report and certificate was prepared. Hence, MCR 6.202 was not applicable.

Defendant also advances arguments related to evidence from a pawn shop. However, it was defendant, not the prosecution, who offered this evidence. Although it is true that a ring was not produced at trial and there was no direct evidence that the ring that defendant pawned had been stolen, the trial court did not rely on any evidence regarding the pawn shop to find defendant guilty.

(MCOA Op. 4-6, ECF No. 15-7, PageID.174-176.) In its application of the *Jackson* standard, the court of appeals carefully reviewed the evidence and considered that evidence in a light most favorable to the prosecution. The analysis on its face is consistent with, not contrary to, clearly established federal law. Furthermore, the factual findings with respect to the evidence offered by the prosecutor appear to be reasonable.

Petitioner does not even attempt to find fault with the state court's application of the *Jackson* standard or its factual findings. Petitioner's argument depends on a negative assessment of Officer Lucas' credibility or a positive assessment of Petitioner's credibility, but those are assessments this Court is not permitted to make on habeas review. *Herrera*, 506 U.S. at 401-02. It is Petitioner's argument, not the state court's determination, that is a patently unreasonable application of the *Jackson* standard. Petitioner's challenge to the sufficiency of the evidence has no merit.

## VI. & VII.    Ineffective Assistance

Petitioner alleges that his counsel rendered ineffective assistance in a myriad of ways. First, Petitioner alleges ineffective assistance when his counsel allowed the police to question Petitioner without counsel being present, and was also ineffective for telling Petitioner to waive the preliminary examination. Petitioner further claims that his counsel was ineffective for allowing him to take the stand to testify in his own defense, and was also ineffective for introducing a pawn shop receipt during the direct examination. In his last ground for habeas relief Petitioner further contends his counsel was ineffective for failing to challenge his arrest warrant and for failing to "object and impeach" Officer Lucas, the prosecution's expert witness. Petitioner's claims are meritless.[3]

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel. To establish a claim of ineffective assistance of counsel, the petitioner must prove: (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy. *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions

---

[3] Some of these ineffective assistance claims are unexhausted as Petitioner never fairly presented them to the Michigan Supreme Court. Petitioner has also not filed his one allotted motion for relief from judgment under MCR 6.500 *et seq.* The habeas statute bars this Court from granting Petitioner relief where he has failed to exhaust his claims in the state court. 28 U.S.C. § 2254(b)(1)(A). The Court is, however, permitted to deny unexhausted claims. 28 U.S.C. § 2254(b)(2). Rather than send Petitioner back to the state courts so that he might exhaust his state remedies and then return to this Court, the Court will consider and deny these ineffective assistance claims because they are without merit.

were hard to attack). The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult." *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)). Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

Where a prisoner has raised multiple claims of ineffective assistance of counsel and the state appellate courts have neglected to address one of the claims, the habeas court's review on the performance prong is *de novo*. Nevertheless, if the prejudice prong was addressed by the state court, that determination is entitled to AEDPA deference. *See Daniel v. Curtin*, No. 10-1895, slip op. at 9 (6th Cir. Aug. 28, 2012). "It should go without saying that the absence of evidence cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.'" *Burt v. Titlow*, 134 S. Ct. 10, 17 (2013) (quoting *Strickland*, 466 U.S. at 689). Disagreement by a defendant with tactics and/or strategy will not support a claim of ineffective assistance. *Strickland*, 466 U.S. at 689.

## A. *Police Interrogation*

On August 15, 2012, Nicole R. Tiachac, an assistant prosecuting attorney from Ingham County, wrote a letter to Petitioner's counsel. In it, she memorialized the fact that she and Petitioner's counsel had discussed Petitioner's case, and that Petitioner had "offered willingly to cooperate with law enforcement and the Ingham County Prosecutor's Office." (ECF No. 15-7, PageID.261.) Ms. Tiachac noted that there had been no plea offers extended, save that Petitioner would be given an opportunity to proffer. The attorney stated that by signing the letter, Petitioner would agree to fully cooperate with law enforcement regarding the events of the May 7, 2011 home invasion. (*Id.*) After tendering his proffer, the letter stated that the prosecutor's office would determine whether any plea offers would be made. The letter stated that, in consideration for his cooperation and truthful statements, nothing Petitioner said or revealed would be used against him, but that if Petitioner lied or engaged in deception, the promise would be null and void. (ECF No. 15-7, PageID.262.)

Furthermore, the letter stated that pursuant to Michigan Rule of Evidence 410, if no final agreement was struck, whatever Petitioner stated could be used for impeachment if Petitioner testified on his own behalf. The prosecution could also make derivative use of whatever information Petitioner provided. Finally, if Petitioner lied, such an untruth could be a predicate for additional criminal charges. (*Id.*) The letter concluded that Petitioner had the right to have his counsel present during the proffer interview. Afterwards, the prosecutor's office would communicate with counsel regarding a possible plea offer. (*Id.*) The letter was signed by Ms. Tiachac, as well as Petitioner and his counsel. (ECF No. 15-7, PageID.263.)

The proffer interview was conducted on October 12, 2012. The record contains a narrative description of the proffer interview where it was noted that Petitioner's counsel indicated the Lansing Police could interview Petitioner at any time. Counsel further stated that he did not need to be present for the interview. (ECF 15-7, PageID.264.) The narrative then describes the statement Petitioner gave during the proffer interview. This statement generally tracks Petitioner's testimony at trial with only a few minor discrepancies. It notes that Petitioner stated he went to a house with Ed Washington under the guise of helping him move. Ed went in the house first, and Petitioner then helped Ed move a safe, a TV, a couple of bags, and a few plastic containers. He did not think anything was wrong until he tried to pawn a TV at a pawn shop, but was told a ring he had previously pawned had been stolen. Petitioner stated that the ring he had pawned was the ring Ed had given to him. (*Id.*)

Petitioner's first ineffective assistance claim alleges his counsel was ineffective when he was absent from the proffer interview. (Pet. 6, PageID.29.) The Michigan Court of Appeals, applying the *Strickland* standard, went directly to the second prong and found that Petitioner could not show prejudice. (MCOA Op. 6, ECF No. 15-7, PageID.176.) Respondent contends that the court of appeals' decision was not contrary to or an unreasonable application of clearly established Supreme Court precedent. (Resp't Br. 41-44, PageID.104–107.) As an initial matter, neither the Michigan Court of Appeals, nor either party, has considered whether counsel's absence during the proffer interview constituted a denial of counsel during a critical stage of the proceedings. If so, the denial of counsel would amount to a *per se* denial of the effective assistance of counsel. *See United States v. Cronic*, 466 U.S. 648 (1984). Under that framework, a reviewing court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when

counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." *Id.* at 659 n.25. "In other words, when counsel is totally absent during a critical stage of the proceedings, prejudice must be presumed." *Mitchell v. Mason*, 325 F.3d 732, 741 (6th Cir. 2003).

In *Bell v. Cone*, 535 U.S. 685 (2002), the Supreme Court defined the differences between claims governed by *Strickland* and claims governed by *Cronic*. *See Henness v. Bagley*, 644 F.3d 308, 323-24 (6th Cir. 2011) (citing *Bell*, 535 U.S. at 695-96 (2002); *Ivory v. Jackson*, 509 F.3d 284, 294 (6th Cir. 2007); *Mitchell*, 325 F.3d at 742). If a claim is governed by *Strickland*, a defendant must typically demonstrate that specific errors made by trial counsel affected the ability of the defendant to receive a fair trial (or caused him to plead guilty). If a claim is governed by *Cronic*, on the other hand, the defendant need not demonstrate any prejudice resulting from the lack of effective counsel. *Mitchell*, 325 F.3d at 742 (citing *Bell*, 535 U.S. at 695); *see Woods*, 135 S. Ct. at 1378 ("*Cronic* applies in 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.'") (quoting *Cronic*, 466 U.S. at 658). Three types of cases warrant the presumption of prejudice: (1) when the accused is denied the presence of counsel at a critical stage; (2) when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; and (3) when counsel is placed in circumstances in which competent counsel very likely could not render assistance. *Henness*, 644 F.3d at 323-324 (citing *Bell*, 535 U.S. at 695-96)); *see also Ivory*, 509 F.3d at 294; *Mitchell*, 325 F.3d at 742. Only the first type could possibly apply here.

As noted above, a writ will not be granted unless the state decision resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal

law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The Supreme Court has not addressed whether a proffer interview constitutes a critical stage. The Sixth Circuit also has not ruled whether a proffer interview is or is not a critical stage of the proceedings. *See United States v. Brummett*, No. CIV.A. 6:12-7200-DCR, 2013 WL 5798013, at *21 (E.D. Ky. Oct. 28, 2013) (addressing a proffer interview, also known as a debriefing session, in the federal context). The Eighth Circuit has assumed, without deciding, that a critical stage existed during a "potential cooperation" phase. *Tinajero-Ortiz v. United States*, 635 F.3d 1100, 1105 n.4 (8th Cir. 2011). Similarly, in *Wingo v. United States*, 341 F. App'x 132 (6th Cir. 2009), the Sixth Circuit assumed a critical stage existed during a debriefing session in a § 2255 case when a cooperation agreement had not yet been signed. The court found that *Cronic* did not apply at that stage because the defendant's counsel was not entirely absent. Counsel had been available to the defendant at that session by phone. Moreover, the court further stated that once the cooperation agreement was signed, the debriefing session ceased to be adversarial. That is, it was no longer a stage where the defendant's rights were in danger of being irretrievably lost if not safeguarded by the presence of counsel. *Id.* at 134–35 (citing *Van v. Jones*, 475 F.3d 292, 298 (6th Cir. 2007). As such, the Court found that *Cronic* did not apply, and the Petitioner was required to demonstrate prejudice. *Id.* at 135.

In this instance, Petitioner signed a cooperation agreement well before the proffer interview took place. Thus Petitioner has moved from the "potential" cooperation periods that were presented in *Tinajero-Ortiz* and *Wingo*, into a phase where his cooperation had been secured. Moreover, his cooperation was obtained with the full assistance of counsel, as evidenced by his

counsel's signature on the proffer letter. "The fact that those proceedings occurred after, with the advice of counsel, Petitioner had signed a [cooperation agreement] indicates that the per se rule in *Cronic* is inapplicable in this case." *Rowsey v. United States*, 71 F. Supp. 3d 585, 607 (E.D. Va. 2014.) This is so because, after signing the cooperation agreement, the proceedings were no longer adversarial where counsel was required to safeguard Petitioner's rights.

Because there does not appear to be clearly established federal law concluding that a proffer interview constituted a critical stage, and because Petitioner (with the advice of counsel) agreed to cooperate, the *Strickland* standard correctly applies to this claim. Petitioner therefore must show prejudice.

The Michigan Court of Appeals found that Petitioner could not:

> Defendant argues fourth that his first appointed counsel rendered ineffective assistance by allowing police to interview him outside counsel's presence. The Sixth Amendment to the United States Constitution and Article I, § 20 of the Michigan Constitution guarantee the right to effective assistance of counsel for criminal defendants. *Strickland v Washington*, 466 US 668, 686; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *People v Pickens*, 446 Mich 298, 338; 521 NW2d 797 (1994). To establish that his counsel did not render effective assistance and therefore that he is entitled to a new trial, "defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012). "'Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise.'" *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009), quoting *People v Solomonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004).

> Without deciding whether counsel rendered deficient performance, we find that defendant has not established prejudice. The prosecution did not use defendant's statement from the interview in its case-in-chief, or to cross-examine defendant. Nor does it appear that the prosecution used any evidence gleaned from the interview. Consequently, we find that there is not a reasonable probability that the outcome would have been different if defendant's counsel had accompanied him at the interview. Accordingly, defendant is not entitled to relief on this issue.

(MCOA Op. 6, ECF No. 15-7, PageID.176.)  The Michigan Court of Appeals applied the *Strickland* standard and rejected Petitioner's claim for lack of merit.  The Court finds that Petitioner has not shown that the state court decision rejecting this claim was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1).  Moreover, the factual determinations the state court relied upon to make its determination are patently reasonable on this record.  Even if Petitioner's counsel rendered deficient performance by failing to appear at the proffer interview, Petitioner cannot show such deficient performance prejudiced him.   Accordingly, Petitioner has failed to demonstrate that he is entitled to habeas relief on this claim.

> B.      *Preliminary Hearing Waiver*

Next, Petitioner contends his counsel was ineffective for advising Petitioner to waive the preliminary hearing.  Even assuming counsel's advice to waive the preliminary hearing fell below an objective standard of reasonableness, Petitioner is required to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Strickland*, 466 U.S. at 669.  Petitioner cannot make that showing.  More specifically, Petitioner cannot show a reasonable probability that, had he not waived the preliminary examination, the trial court would not have found probable cause and dismissed the charges.  As previously discussed, there was abundant evidence of Petitioner's guilt introduced at trial, and  this evidence was available to the prosecution when Petitioner waived his preliminary examination.  As such, there is not a reasonable probability that the court would have found a lack of probable cause following the preliminary examination and dismissed the charges. This claim is thus without merit.

C.      *Allowing Petitioner to Testify*

Next, Petitioner alleges his counsel was ineffective for allowing him to take the stand and testify. By taking the stand, Petitioner was exercising his constitutional right to testify. *See Rock v. Arkansas*, 483 U.S. 44, 51 (1987) ("[t]he right to testify on one's own behalf at a criminal trial has sources in several provisions of the Constitution" as one of the rights essential to due process under the Fourteenth Amendment, the right to call himself as a witness under the Sixth Amendment, and as "a necessary corollary to the Fifth Amendment's guarantee against compelled testimony"); *United States v. Webber*, 208 F.3d 545, 550 (6th Cir. 2000) ("[t]he right of a defendant to testify at trial is a constitutional right of fundamental dimension and is subject only to a knowing and voluntary waiver by the defendant"). When a defendant wants to exercise his right to testify, the defense counsel's role is to advise the defendant on whether the defendant should take the stand. *Webber*, 208 F.3d at 551. However, "the ultimate decision to testify rests with the defendant." *Id.* Thus, "[a] defendant who wants to testify can reject defense counsel's advice to the contrary by insisting on testifying, communicating with the trial court, or discharging counsel." *Id.* Petitioner has not established that counsel was ineffective or that he was deprived of counsel during a critical stage of the proceedings. Petitioner provides only a conclusory assertion that his attorney failed to inform him he did not need to take the stand.

Even upon the most indulgent reading of the petition, Petitioner does not allege he was unaware that he could remain silent, and did not know he did not need to take the stand. Indeed, the facts of this case and Petitioner's criminal history points the other way. Moreover, under his theory of the case, it is difficult to see how Petitioner could not take the stand to present his argument. In sum, Petitioner has only shown that he insisted on testifying (as was his right) and now

he regrets the consequences of that decision.  Accordingly, Petitioner's claim should be denied.

D.     *Introduction of Pawn Shop Receipt*

Petitioner next contends that his trial counsel was ineffective for introducing a pawn shop receipt on direct examination.  (Pet. Br., PageID.26-28.)  Petitioner claims that the receipt was irrelevant to the case, negatively impacted his credibility and furthermore, notwithstanding the court of appeals decision, was used by the trial court to find him guilty.  The Court disagrees.

It is clear that Petitioner's counsel pursued a strategy of arguing that Petitioner did not intend to commit home invasion, and rather believed he was helping an acquaintance (Mr. Washington) move items he was lawfully allowed to possess from a residence he was lawfully allowed to be present in.  At the beginning of the defense presentation, counsel informed the court that the evidence would show Petitioner was asked to move a safe, and indeed did help move the safe.  Furthermore, counsel stated that the evidence would show Petitioner was compensated for his efforts.  (Trial Tr. 47, PageID.153.)

When Petitioner got on the stand, he testified that after helping Mr. Washington, the two went back to Petitioner's home and drank peppermint Schnapps.  Thereafter, Mr. Washington left with all the items that had been removed from the house.  A "couple days later" Petitioner saw Mr. Washington again.  On that occasion, Mr. Washington gave him the ring.  Petitioner's counsel asked whether he received the ring in appreciation for helping Mr. Washington move the items.  (Trial Tr. 62, PageID.156.)  Petitioner's answer was not entirely responsive or clear.  Petitioner stated "I believe something like if he had a lick or something like that, and he pretty much gave me a wise look like, you know, he didn't come clean with me, but I didn't think nothing of it." (*Id.*)  Petitioner's counsel then asked whether Petitioner asked Mr. Washington how he had obtained the

ring. Again, Petitioner gave a nebulous response, although he admitted that "People don't just give away gold rings." (*Id.*).

Petitioner then testified that he pawned the ring at a local pawn shop. Sometime later he tried to pawn some DVDs, but was told that they could not be accepted because Petitioner had previously pawned a stolen ring. Petitioner then testified he asked for the receipt from the pawning of the ring, but was told the shop did not have it. At that point, Petitioner's counsel asked whether Petitioner talked to Mr. Washington about the stolen ring. Petitioner indicated he did not. Counsel then introduced the pawn shop receipt. (Trial Tr. 63-66, PageID.157.) Counsel asked Petitioner to identify the date on the slip, and Petitioner responded that it was May 7, 2011, the day of the home invasion. Counsel then asked whether that helped refresh Petitioner's memory of the events regarding the ring. (Trial Tr. 66, PageID.157.) Petitioner testified that he did not doubt the date was correct. (Trial Tr. 67, PageID.158.)

Petitioner alleges ineffective assistance because his counsel corrected his recollection of the events. He claims the receipt was unnecessary to his defense that its introduction only served to negatively impact his credibility. Applying the above *Strickland* standard, the court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, counsel's act of introducing the pawn shop receipt was "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. Even if the court were to determine that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691. Petitioner cannot make this showing.

It was Petitioner who brought up the receipt for the first time. Faced with the discrepancy between the testimony on the pawn shop receipt, it was not unreasonable for counsel

to seek to clean up the confusion.  Moreover, the fact that Petitioner in fact pawned the ring on the day of the home invasion would bolster the theory that Petitioner had helped Mr. Washington move some items and that he received payment in appreciation of the services rendered rather than, as Petitioner seemed to have testified, as a gift.  In the opinion of the undersigned, Petitioner cannot establish that his counsel constitutionally erred by introducing the pawn shop receipt.

       E.       *Confrontation and Illegal Arrest*

Next, Petitioner contends that his counsel was ineffective when he failed to call the officer who signed his arrest warrant, Officer Funk, during the defense presentation.  (Pet. Br. 7, PageID.35.)  Petitioner argues that his attorney's failure to call as a witness the officer that signed his arrest warrant amounted to a violation of his rights under the Due Process Clause and the Confrontation Clause.  Petitioner further contends that his counsel was ineffective for failing to challenge his illegal arrest.

The Confrontation Clause of the Sixth Amendment gives the accused the right "to be confronted with the witnesses against him."  U.S. CONST., Am. VI; *Pointer v. Texas*, 380 U.S. 400, 403-05 (1965) (applying the guarantee to the states through the Fourteenth Amendment).  "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  *Maryland v. Craig*, 497 U.S. 836, 845 (1990).  The Confrontation Clause therefore prohibits the admission of an out-of-court testimonial statement at a criminal trial unless the witness is unavailable to testify and the defendant had a prior opportunity for cross examination. *Crawford v. Washington*, 541 U.S. 36, 59 (2004).

There is nothing in this case to indicate that the officer's testimony was necessary to prove the charges at issue, or that any testimony from the officer was allowed into evidence that would implicate the Confrontation Clause. Accordingly, Petitioner has failed to demonstrate a constitutional violation. *See Briggs v. Curley*, No. 2:12-CV-151, 2015 WL 753168, at *1 (W.D. Mich. Feb. 23, 2015). His counsel, therefore, was not ineffective for failing to call Officer Funk as a witness in this case.

Petitioner relatedly contends that his counsel was ineffective for failing to challenge his allegedly illegal arrest. Petitioner restates his earlier contention that he was "never arrested at the scene of [the] alleged crime by anyone involved in this case; no one in this case saw Petitioner break into this house or arrested Petitioner with any alleged evidence and there's no proof of a print of Petitioner's found at the scene other than a [Lansing Police Department) officer <u>saying</u> so – absent proof. (Pet. Br. 7, PageID.35.) Again, Petitioner's claims do not demonstrate his warrant was deficient. Petitioner puts forth no authority that he was required to be arrested at the scene, or he needed to be caught in the act in order to be arrested. Moreover, Petitioner's contention that there was no proof of a print of Petitioner's found at the scene, other than an officer's assertion, is demonstrably false. Indeed, Petitioner admitted being at the scene of the crime and handling items. Officer Bahl testified taking prints from the scene. Officer Lucas testified that, in his expert opinion, these prints matched known prints of Petitioner. Accordingly, this claim is meritless. Because Petitioner's claim fails on the merits, his counsel was not ineffective for failing to raise a meritless claim. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492,

506 (6th Cir. 2007); *Chegwidden v. Kapture*, 92 F. App'x 309, 311 (6th Cir. 2004); *Harris v. United States*, 204 F.3d 681, 683 (6th Cir. 2000). This claim of error should be denied.[4]

F.       Expert Witness

Finally, Petitioner contends his attorney was ineffective for stipulating to the prosecution's introduction of Officer Lucas as an expert in latent fingerprint identification.

During it's case-in-chief, the prosecution called Officer Lucas and began by laying the following foundation:

Q.       Sir, could you please state your name and spell it for our record?

A.       My name is Kenneth Lucas, L-u-c-a-s.

Q.       Sir, where are you currently employed?

A.       I am employed by the Lansing Police Department.

Q.       What is your title or position over at the Lansing Police Department?

A.       My title is fingerprint technician.

Q.       How long have you been employed as a fingerprint technician with the Lansing Police Department?

A.       About 15 years.

Q.       And have you worked in the field of latent print identification prior to being with the Lansing police?

A.       Yes ma'am, I have.

---

[4] In a supplement to his response to the Commissioner's brief, Petitioner appends a local news article noting that the complaining officer had resigned after a traffic incident. In that article, the officer's attorney mentioned that there had been a dispute between the officer and the police department regarding invalid warrantless arrests. (ECF 19-1, PageID.492.) Petitioner supposes that he too was subject to an invalid warrantless arrest. Petitioner fails to demonstrate, however, how his counsel was ineffective for failing to raise the information contained in this article, which was dated well after his trial. In any event, this information is inapposite. As Petitioner himself admits, a warrant was issued for Petitioner's arrest in this case. Accordingly, Petitioner was not placed into custody pursuant to a warrantless arrest.

Q.     And can you describe that experience?

A.     I have been a latent print examiner for about 40 years. I am a retired Michigan State Police officer. I worked for the Michigan State Police for about 30 years. For the majority of my career with the Michigan State Police, the last 25 plus years, I was assigned to the forensic science division, and during that entire period of time I did work as a latent print examiner.

Q.     Have you had any specialized training as a latent print examiner?

A.     Yes, I have. I have completed various courses of study which pertain to the field of latent print identification. Among the courses I have completed have been a course of study through the institute of applied science. That course of study dealt in latent print identification and also criminal investigation. I have completed a course in advanced latent print identification, and that course of study was given by the FBI, Federal Bureau of Investigation. And I have also completed a training period, it was approximately a year and -a-half in length, in the field of latent print identification, and I received that training from the Michigan State Police.

Q.     Have you ever been qualified to testify as an expert in latent print identification?

A.     Yes, I have.

Q.     Do you recall approximately how many times?

A.     It would be, it would be many dozens of times, yes.

Q.     Were any of those times here in Ingham County?

A.     Yes.

MS. MATUSKO:     Your Honor, at this time I would offer Mr. Lucas as an expert in the latent print identification?

MR. WARREN:     We would have no objection to that, Your Honor. It's clear that he is qualified.

THE COURT:     Okay. Yeah, he has been here before. Thank you. He is an expert.

(Trial Tr. 37-39, PageID.150-151.)  Petitioner has failed to demonstrate his counsel's decision to stipulate to Officer Lucas's qualifications, rather than requesting a *Daubert* hearing, was outside the realm of trial strategy.  Moreover, Petitioner has not argued, nor can he, that officer Lucas lacked appropriate education, training or experience to be qualified as an expert.  As noted by the trial court, Officer Lucas had previously testified as an expert before the presiding judge.  Any challenge to the officer's expertise, therefore, would almost have certainly failed.  Accordingly, Petitioner cannot show his counsel acted unreasonably in stipulating to the officer's testimony. Nor can Petitioner demonstrate prejudice.  Accordingly Petitioner is not entitled to relief on this claim.

## Certificate of Appealability

Even though I have concluded that Petitioner's habeas petition should be denied, under 28 U.S.C. § 2253(c)(2), the Court must also determine whether a certificate of appealability should be granted.  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying

this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

I find that reasonable jurists could not conclude that this Court's denial of Petitioner's claims would be debatable or wrong.  Therefore, I recommend that a certificate of appealability should be denied.

## **Recommended Disposition**

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.  I further recommend that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  May 30, 2017            /s/ Ray Kent_____
                               RAY KENT
                               United States Magistrate Judge


### **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)©; Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).